| | | |
|---|---|---|
| JOY B. HIKEL, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 1:13-cv-00075-DBH |
| | ) | |
| TOWN OF MADISON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION ON
MOTION FOR SUMMARY JUDGMENT**

In this case, Plaintiff Joy B. Hikel seeks to recover damages allegedly resulting from the conduct of Defendant Town of Madison in connection with Plaintiff's employment with Defendant. In particular, Plaintiff maintains that Defendant discriminated against her on the basis of sex, and that Defendant retaliated against her for complaining of discrimination.

The matter is before the Court on Defendant's Motion for Summary Judgment (ECF No. 22.)[1] As explained below, because Plaintiff has failed to establish more than a prima facie case on her claim of sex discrimination, the recommendation is that the Court grant Defendant's Motion for Summary Judgment on Count I. Because disputed factual issues remain with respect to the claims of retaliation in Counts II and III, the recommendation is that the Court deny Defendant's Motion for Summary Judgment as to Counts II and III. Finally, because Plaintiff concedes that Defendant is entitled to judgment on Count IV, the recommendation is that the Court grant Defendant's Motion for Summary Judgment on Count IV.

---

[1] The Court referred the Motion for report and recommendation.

# FACTUAL BACKGROUND

In her amended complaint (ECF No. 11), Plaintiff asserts four claims: sex discrimination (Count I), retaliation (Count II), whistleblower retaliation (Count III), and a claim for unpaid wages (Count IV). Plaintiff concedes that judgment should enter against her on Count IV. (Opposition at 17, ECF No. 27.) The facts set forth herein are derived from the parties' Local Rule 56 statements of material facts, and are presented in the light most favorable to Plaintiff.[2]

The Town of Madison appointed Plaintiff to the position of Economic Development Director effective November 3, 2008, with an annual salary of $42,500. (DSF[3] ¶ 2.) Plaintiff was selected after an interview with a panel that reviewed applicants for the position, which panel included a member of the Board of Selectmen. Based on the panel's recommendation, Town Manager Norman Dean hired Plaintiff. (PSAF[4] ¶ 98.)

In his October 16 letter of appointment, Dean notified Plaintiff that she would "come under the personnel policy." (*Id.* ¶ 99; Hikel Dep. Ex. 2, ECF No. 26-4.) Plaintiff received the Madison Personnel Policy on October 22, 2008, and signed an acknowledgement form reflecting that she had received the policy. (DSF ¶ 4.) According to the form, by signing it, Plaintiff represented that she understood that the conduct or practice of the Town could not establish an implied contract regarding any term or condition of employment. (*Id.* ¶ 5.) The parties executed an employment agreement on July 1, 2009. The agreement provided, among other things that "[n]othing in this agreement shall prevent, limit or otherwise interfere with the right of the Town Manager to

---

[2] Because Plaintiff concedes that Defendants are entitled to summary judgment on Count IV, the factual recitation does not include the record facts that are relevant solely to Count IV.

[3] Defendant's Statement of Facts, ECF No. 26.

[4] Plaintiff's Statement of Additional Facts, ECF No. 29.

terminate the services of the employee at any time." (*Id.* ¶ 3.) Prior to the incidents about which Plaintiff complains, Plaintiff did not grieve any matter regarding her employment with the Town. (*Id.* ¶ 6.)

At a Board meeting on February 28, 2011, Plaintiff and two other department heads, Police Chief Barry Moores and Road Commissioner Glen Mantor, proposed that the Board increase their pay and vacation time. (PSAF ¶ 100.) After an executive session, the Board voted to increase Plaintiff's pay by $1.25 per hour, to give Police Chief Barry Moores a raise of $1.60 per hour and one additional week of vacation, and to increase Road Commissioner Glen Mantor's compensation by $1.60 per hour. The $1.25 pay increase that Plaintiff received was the same raise given to all town employees. (DRSF[5] ¶ 102.) Plaintiff requested, but was denied, more vacation time. (DSF ¶¶ 7-8.) At the time, Plaintiff had worked for the Town for a little less than three years, whereas the Police Chief and Road Commissioner had worked for the Town for approximately nine years. (DSF ¶¶ 12-13.) In addition to these three employees and the Town Manager, the Town employed a fourth department head, a part-time Fire Chief. (*Id.* ¶ 26.)

In a letter to the Board in March 2011, Plaintiff asserted that she was the victim of gender discrimination and requested that she receive the three step increases that she claimed she was owed under the Personnel Policy, and a week of vacation time commensurate with the vacation time given to the Police Chief. (*Id.* ¶ 10.) Plaintiff alleges that the Board members "reacted negatively and were not happy about [her] complaint." (PSAF ¶ 103.) Plaintiff also called the Board Chair, Robert Hagopian, and expressed her view that she was the victim of gender discrimination. (*Id.* ¶ 105.) At a March board meeting, Hagopian suggested that Plaintiff was not

---

[5] Defendant's Reply Statement of Facts, ECF No. 29.

subject to the Personnel Policy's longevity pay provisions because of her employment agreement. (*Id.* ¶ 106; DRSF ¶ 106.)  One board member stated, "We pay you enough."  (PSAF ¶ 106.)

Plaintiff complained of discrimination in another letter to the Board of Selectmen, dated March 29, 2011.  (Hikel Dep. Ex. 7, ECF No. 26-8.)  Plaintiff states that she wrote the letter when she did because no action was taken on her request at the March board meetings and she wished to reiterate her request.  (PSAF ¶ 109.)

At a May 10, 2011, Board meeting, Plaintiff again requested an increase in her compensation.  Selectperson Bruce Bristow made a motion, which carried, that the town attorney, Lee Bragg, review Plaintiff's contract and the Personnel Policy to determine Plaintiff's entitlement to salary step increases.[6]  (DSF ¶ 11; PSAF ¶ 110.)  Previously, Mr. Bristow had voted against giving Plaintiff a raise beyond the $1.25 per hour that was given to all employees.  (PSAF ¶ 107.) According to the then Town Manager, Norman Dean, the Board was confused about whether Plaintiff's position was subject to the Personnel Policy because she was salaried and had a written employment contract.  (DSF ¶ 14; PSAF ¶ 112; DRSF ¶ 112.)  Sometime in June 2011, Dean likely notified the Board that Attorney Bragg's opinion was that Plaintiff's employment contract was subject to the Personnel Policy.  (DSF ¶ 16; POSF[7] ¶ 16; PSAF ¶¶ 113-114.)  Mr. Bragg's opinion letter is dated June 20, 2011.  (Hikel Dep. Ex. 9, ECF No. 26-9.)

During Dean's tenure as town manager, Plaintiff wrote a comprehensive plan for the Town of Madison.  (PSAF ¶ 160.)  She also wrote and helped form the Madison Business Alliance, which

---

[6] Also on May 10, Dean wrote Plaintiff a letter of reprimand for addressing a coworker in an unprofessional manner on May 4.  In that letter Dean stated that Plaintiff came under the Personnel Policy, which prohibits "inappropriate, improper, or unprofessional conduct while on the Town of Madison's premises or performing the Town's business." (PSAF ¶ 111; Hikel Dep. Ex. 8, ECF No. 28-2.)  Plaintiff herself states that Dean had no issues with her job performance and "got along with her just fine."  (PSAF ¶ 115.)

[7] Plaintiff's Opposing Statement of Facts, ECF No. 28.

supplanted what Dean referred to as a dysfunctional Chamber of Commerce. (PSAF ¶ 116; Dean Dep. at 28-29, ECF No. 28-4.)

By the end of June 2011, Madison had a new Town Manager, Dana Berry. At some point after assuming the position, Berry became aware of the issue concerning Plaintiff's pay and her request for a retroactive increase. (DSF ¶ 18.) Plaintiff's possible salary increase was on the agenda for the first Board meeting that Berry attended (July 11, 2011). (*Id.* ¶¶ 19, 22.) Prior to the meeting, Berry twice told Plaintiff that she need not attend the executive session and that she could trust him to handle it for her. He did not, however, tell her she could not attend. (*Id.* ¶¶ 20-21; POSF ¶¶ 20-21.) Plaintiff elected not to attend the meeting. (PSAF ¶ 120.) As the result of the executive session on July 11, the Board voted to give Plaintiff $3,690 in retroactive pay. (DSF ¶ 22.) In addition, the Board renewed her salary as of July 1, 2011, and recalculated the salary to $47,388.64 per year. (*Id.* ¶ 24.) Some members of the Board did not want to give Plaintiff the raise, but when the Town's attorney, Lee Bragg, advised that Plaintiff was entitled to the increase, the salary increase was considered to be a "done deal." (PSAF ¶ 121.)

On July 21, 2011, Plaintiff learned that on behalf of the Town, Berry wanted to install stairs on a riverfront property that she owned, over which property the Town had a right-of-way. Evidently, the stairs would serve as a place for the public to remove canoes from the water. Berry claimed that the Town's proposal was permissible. Plaintiff, however, advised that the installation was not possible because the proposed use was in a critical natural resource area. Berry then became "belligerent," and told Plaintiff that her opposition to the public use would put her job in jeopardy. (*Id.* ¶¶ 122-23; DRSF ¶¶ 122-23; DSF ¶ 29.)[8]

---

[8] This statement is qualified on the record with an effort to place Berry's assertion in context – that townsfolk had used the location for years and that Plaintiff's desire to preclude public use due to erosion and littering would result in repercussions at town meetings and that public displeasure might cause the Board not to fund her position. (DRSF

When Berry became Town Manager, the Board instructed him that he was not to commit tax increment financing ("TIF") money for downtown improvements without Board involvement and approval. (PSAF ¶ 117; *see also* Hikel Dep. Ex. 21, ECF No. 26-16.) According to Hagopian, the Board wanted to have prior knowledge of where money would be spent. (DRSF ¶ 117.) [9]

In an August 2011 Board meeting, Dana Berry requested a $100,000 increase in the Revolving Loan Fund (which had been originated by Plaintiff, who wrote the grant and the underwriting for the Fund) without any prior mention of his intention to Plaintiff. Plaintiff viewed this as "going behind her back." (PSAF ¶ 125.)

At some point, the Board instructed Berry to move Plaintiff to a different office. (*Id.* ¶ 126.) Plaintiff never requested a different office. (*Id.* ¶ 127.) [10] The prior Town Manager had allowed Plaintiff to work from home on Mondays for this reason, but Berry preferred to have Plaintiff in the office, and she was moved to a new office. (DRSF ¶¶ 126-27.) [11] Berry never consulted Plaintiff about the planning or layout of her office. (PSAF ¶ 166.)

Berry admits that he yelled at Plaintiff on two or three occasions. (*Id.* ¶ 130.) Berry never yelled at the Police Chief or the Road Commissioner (the Commissioner says otherwise), and never

¶ 123.) When questioned about this discussion at his deposition, Berry initially refused to answer without first reviewing a response to Plaintiff's related grievance, a response prepared with the aid of counsel. Subsequently, he answered without first reviewing the grievance response. (PSAF ¶ 124; DRSF ¶ 124.)

[9] This qualification is offered in response to the assertion that the Board and Berry did not attempt to "monitor" the expenditures made by other department heads, who were male, and who had much larger budgets. (PSAF ¶ 118; DRSF ¶ 118.) Berry asserts that all department expenses are monitored, but that the warrants for public safety and roads are unrelated to TIF funding. (DRSF ¶ 118.) Former Town Manager Dean has testified at deposition that he was never told by the Board to "closely scrutinize" the economic development budget, which was funded with TIF money. (PSAF ¶ 119.)

[10] Plaintiff's statement is qualified rather than denied by Defendant. The qualification is that it was understood that she would prefer a different office because her office lacked a door and she was frequently interrupted by people looking for the code enforcement officer.

[11] According to Plaintiff, the new office was smaller. According to Berry, the new office was larger. (PSAF ¶ 128; DRSF ¶ 128.) Defendant's statement that the office was actually larger is not denied by Plaintiff, but she complains that it was narrower and looked smaller. (DSF ¶ 38; POSF ¶ 38.)

yelled at any other female town employees. (*Id.* ¶ 131; DRSF ¶ 131.) One occasion on which Berry yelled at Plaintiff was when he asked her to give him all of the revolving loan files for selectman Al Veneziano to review. Berry also raised his voice with Plaintiff when she requested that her new office be carpeted. (PSAF ¶ 133.)

Berry and Hagopian made the decision to exclude Plaintiff from a meeting with the representatives of Kennebec Valley Gas Company regarding the pipeline project. Berry told Plaintiff that he and Hagopian decided not to involve her because the meeting was with the chief officers and she was not a chief officer. Plaintiff, however, had worked on the project from the start, and her knowledge of the project at that time exceeded the knowledge of Berry and Hagopian. (*Id.* ¶¶ 136-37.) Plaintiff raised her voice in a discussion with Berry on November 14, 2011, because Berry excluded her from the meeting with the principals of the Kennebec Valley Gas Company. (DSF ¶ 40.)

On November 15, 2011, Plaintiff filed a grievance against Berry. (*Id.* ¶ 27; PSAF ¶ 138.) She addressed her grievance to the Chairman of the Board of Selectmen, Robert Hagopian, and attached documentation of several incidents that took place over several months. Plaintiff claimed that Berry interfered with her job performance, engaged in inappropriate, improper, or unprofessional conduct, and/or acted inappropriately toward her. (Hikel Dep. Ex. 12, ECF No. 26-12.) In the grievance letter, Plaintiff did not allege sex or gender discrimination. Plaintiff, however, maintains that given her previous complaints, her grievance about Berry was "clearly" a complaint that she was being treated differently than the male department heads. (POSF ¶ 28.) She also notes that one of her complaints concerned restraints on spending her budget, a restriction that was not imposed on the "other Department Heads." (PSAF ¶ 141.)

The Board heard Plaintiff's grievance in executive session during a Board meeting on December 13, 2011. According to Plaintiff, the Board told her to choose three matters to address. (PSAF ¶ 142.) During the hearing, one selectperson, George Elias, referred to Plaintiff as "Candy," and explained his mistake by saying that Plaintiff's issue was "similar to Candy's case." (PSAF ¶ 174.) The reference was to Candy Testa, who previously sued the Town of Madison, alleging whistleblower retaliation, in a case in which this Court entered summary judgment in favor of the Town. In a December 22, 2011, letter, Chairman Hagopian advised Plaintiff of the results of the Board's deliberation on her grievance. (DSF ¶ 41; PSAF ¶ 142; Hikel Dep. Ex. No. 21, ECF No. 23-16.)

In its response to the grievance, the Board stated that it instructed Berry to move Plaintiff's office because she had complained that the public thought she was a secretary and would interrupt her; that the Board had instructed Berry at the time of his hire that no one was to spend the TIF funds or the Economic Development budget without board approval; that Berry "is your boss and has a right to decide who attends what meetings;" and that the Board instructed Chairman Hagopian to speak to Berry about raising his voice. (Hikel Dep. Ex. 21.)

During a January 23, 2012, Board meeting, the Board went into executive session for over an hour to discuss the Pipeline Project. When the Board emerged from the executive session, Selectman Elias moved that "our Economic Development Director is taken off anything to do with gas pipeline coming to Madison and that our Town Manager spearhead the operation as of tonight." (PSAF ¶ 144; DSF ¶ 43.) Following discussion, the motion was withdrawn and Selectman Veneziano moved "that Dana Berry, Town Manager, is the only public spokesman for the Town of Madison on the natural gas pipeline [to] include public speaking at the Legislature, in the newspapers, and with the general public." (PSAF ¶ 144.) That motion carried. (*Id.*) During this

executive session, someone alluded to Plaintiff's testimony before the Legislature as a "train wreck." (*Id.* ¶ 145.)[12] Plaintiff complains that she was not informed that she would be discussed at the January 23, 2012, meeting or invited to the executive session which led to the Board's decision. (*Id.* ¶ 147.) Plaintiff asserts that she asked Hagopian why she was no longer the spokesman for the Project and that he told her that four of the five selectmen did not like her. (*Id.* ¶ 148.)

On March 13, 2012, the Board of Selectmen, Dana Berry, and representatives of Kennebec Valley Gas Company went into an executive session for what Chairman Hagopian said was to deal with "economic development." Plaintiff and citizens of the Town "expressed bewilderment" that the Town's Economic Development Director would be excluded from an executive session focused on economic development. (*Id.* ¶ 149.)

On March 20, 2012, the Board of Selectmen held an executive session "to discuss a personnel matter." (*Id.* ¶ 150.) By letter dated March 23, 2012, Berry provided Plaintiff with a 90-day written notice that her employment contract with the Town of Madison would not be renewed upon its expiration on June 30, 2012. (*Id.* ¶ 151; DSF ¶ 44; Hikel Dep. Ex. 23, ECF No. 26-18.) In an April 12, 2012, letter to Plaintiff, Berry set forth the reasons for his decision not to renew her contract. (DSF ¶ 45; POSF ¶ 45; Hikel Dep. Ex. 24, ECF No. 26-19.) Berry stated in the letter that the non-renewal was based on their inability to work well together. (DSF ¶ 46.)

Berry denies that Plaintiff's gender had anything to do with the employment decision or with the decision to exclude her from meetings related to the pipeline project. (*Id.* ¶¶ 47, 49.)

---

[12] Chairman Hagopian testified that he did not recall who made this comment, but that Plaintiff's testimony before the Legislature did not play a role for him in the decision. According to Hagopian, "it was a big project coming to Madison and it was very important to the people of Madison and we needed the Town Manager on board to do this." (DRSF ¶ 145; Hagopian Dep. at 35, ECF No. 29-1.) Plaintiff states that Berry had reviewed a draft of her testimony before the legislative committee in advance, had approved it, and said she did a good job after listening to a live stream of her testimony. (PSAF ¶ 146.)

Berry also denies that Plaintiff's request for a pay increase or additional vacation or the lengthy process regarding Plaintiff's request for additional pay had anything to do with the decision. (*Id.* ¶ 48.) Berry stated that he and Plaintiff simply did not mix well. (*Id.* ¶ 46.) [13]

When Plaintiff's employment contract was not renewed, she was earning approximately $48,000, which compensation increased to $60,000 with benefits. (*Id.* ¶ 51.) In the 12-month period following the non-renewal of Plaintiff's contract, the Town retained an independent contractor to work as the Economic Development Director, and has paid the independent contractor between $29,000 and $30,000 annually. (*Id.* ¶ 52.) At present, the Town does not have a director, but employs a consultant to do economic development work. (*Id.* ¶ 64.) The individuals who have held the position have been male. (*Id.* ¶ 65; PSAF ¶ 156.)

Beginning at the end of January 2012 and continuing to the end of March 2012, Plaintiff continued to work as the Economic Development Director for the Town of Madison. During this time, Plaintiff received one e-mail from Dana Berry that was specifically addressed to her—an e-mail request that she research playground grants. (DSF ¶ 53; POSF ¶ 53.) In this same time period, Plaintiff completed the Downtown CDBG application as well as a COP FAST Grant. (DSF ¶ 54.) [14]

---

[13] During his deposition, when asked by Plaintiff's counsel, "Tell me now—this is your one chance—every reason that you chose not to renew Ms. Hikel's contract," Berry said he had listed the reasons in the letter notifying Plaintiff of the reasons and Berry repeatedly told Plaintiff's counsel that he would like to review the letter before answering. (PSAF ¶ 152.) Counsel insisted that he had a right to "test" Berry's memory. (Berry Dep. at 43, ECF No. 28-6.) Berry stated he could not remember and wished to refer to the letter. (*Id.* at 44:22 ("I don't recall without refreshing my memory.").) Berry acknowledged that the letter had been prepared with the aid of counsel. (*Id.* ¶ 52:21-53:1.)

[14] Although Plaintiff's position as Economic Development Director for the Town ended as of June 30, 2012, Plaintiff received certification from her doctor that she was unable to work between April 11, 2012, and July 1, 2012. (DSF ¶¶ 55-56.)

Berry maintains that he alone made the decision not to renew Plaintiff's contract and that he informed the Board of that fact without seeking its approval. Berry states that he told the Board that he did not renew the contract because he did not have a good working relationship with Plaintiff. (DSF ¶¶ 58-61.) While Plaintiff concedes that the town manager is responsible for the hiring and firing of direct reports under the town manager form of municipal government, she maintains that the Board was involved in the non-renewal decision. (*Id.* ¶ 60; POSF ¶¶ 58-61.)

### A. Glen Mantor Testimony

Glen Mantor has worked as the Road Commissioner for the Town of Madison for approximately 12 or 13 years. He was previously a selectman for eight years. (DSF ¶ 67.) On one occasion, Berry scheduled a meeting with third parties on a road construction or road maintenance matter without involving Mantor or inviting him. (*Id.* ¶ 68.) On two other occasions, Berry scheduled meetings involving road matters, but invited Mantor to attend. (*Id.* ¶ 69.) Mantor recalls attending a town meeting at which Plaintiff complained to the Board that she was being treated differently than male department heads. (*Id.* ¶ 71.) When Berry first became town manager, Mantor felt that Berry micro-managed Mantor's budget, but that process stopped without Mantor ever complaining about it. (*Id.* ¶ 72.) Mantor remembers that Berry raised his voice with Mantor "probably twice." (*Id.* ¶ 75.)

Mantor characterized Berry's management style as secretive and very controlling. (*Id.* ¶ 81.) In Mantor's view, this was "night and day" as compared to the management style of former Town Manager Norman Dean. (*Id.* ¶ 82.) Mantor believes that Plaintiff did a good job as Economic Development Director and made more money for the Town than what her salary cost the Town. (PSAF ¶ 153.) Mantor also believes that Hikel was not "treated very good at the last

of it." (*Id.* ¶ 154.) Mantor testified that on one occasion—he could not recall when[15]—Berry told him that a new manager should be able to have new people. (*Id.* ¶ 155.)

## B. Robert Hagopian Testimony

As of 2012, Robert Hagopian was no longer a member of the Board of Selectmen. (DSF ¶ 86.) Hagopian was not personally involved in the panel that interviewed and recommended Plaintiff's hiring, nor was he involved in the decision by Norman Dean to hire Plaintiff. (*Id.* ¶ 87.) According to Hagopian, the decision to deny Plaintiff's request for additional vacation time was based on the fact that Plaintiff had only been on the job for three years, whereas the Chief of Police and the Road Commissioner had worked for the Town for 10 to 12 years. (*Id.* ¶ 89.) Hagopian testified that initially the Board did not act on Plaintiff's request for step increases because the Board looked at Plaintiff's contract and perceived "a personnel policy problem" for which it wanted legal advice. (*Id.* ¶ 90.) Hagopian also testified that Plaintiff's gender had no bearing on these decisions (*id.* ¶ 96), and that the Board had no involvement in the decision not to renew Plaintiff's contract. (*Id.* ¶ 93.)

The Town replaced Plaintiff with a man, Tim Curtis, who had limited knowledge of grants. According to Hagopian's testimony, Plaintiff was by far the better economic development director, with years of experience in the job. (PSAF ¶ 156.) Plaintiff maintains that Berry told a representative of the Maine Human Rights Commission that he hired his "faith brother" to replace Plaintiff. (PSAF ¶ 157.)[16]

---

[15] Mantor stated that it was said to him after Berry "terminated" Plaintiff's position. Then he said he believed it was said "during the process." Finally, he said he did not remember when it was. (Mantor Dep. at 45-46.)

[16] Berry does not believe he used that term. (DRSF ¶ 157.)

### C. Triss Smith Testimony

Triss Smith, Finance and Human Resources Officer for the Town of Madison for over 12 years, including during the entirety of Plaintiff's employment as Economic Development Director, holds a favorable view of Plaintiff's performance in office, including Plaintiff's work product, work ethic, energy, demeanor, and positive work experience with Town Manager Norman Dean. (PSAF ¶¶ 158-62.) Smith asserts by affidavit that Berry's management approach toward the female employees in the office differed from that of Norman Dean. According to Smith, Berry viewed female employees, including Plaintiff, as working for him, not with him. (*Id.* ¶ 163.) Smith reports that Berry tended to micro-manage all the female support staff, including Plaintiff. (*Id.* ¶ 164.)[17] Smith did not observe Berry exercise a similar level of micromanagement over the male Code Enforcement Officer, the male Assessor, the male Chief of Police, or the male Road Commissioner. (*Id.*)

Smith witnessed Berry's agitation with Plaintiff's request that the lights in her office be changed. Smith describes Berry as being very stern in this instance, and as using a loud tone of voice to reply to Plaintiff regarding the request. Smith never observed Berry engage in similar behavior with the Code Enforcement Officer, the Assessor, the Road Commissioner, or the Chief of Police. (PSAF ¶ 167.)

According to Smith, when Berry was out of the office he would have an employee, Tim Curtis, or a Selectman randomly appear at the office to determine whether the female support staff were performing their jobs. (*Id.* ¶ 168.) Smith also saw Berry eavesdropping on conversations of

---

[17] Smith offers two examples of how Berry micro-managed her in her work as Finance and Human Resources Officer. First, she says that Berry double-checked her work, without notice to her, and looked at the underlying records to see whether her summary details were correct (which they were). Berry did this even though he had no background in town finances beyond his prior service as a Selectman. Second, Berry would second-guess her and refused to follow through on human resources recommendations that she made to him – something that she had never experienced with Town Manager Dean. (PSAF ¶ 165.)

support staff such as Kathy Estes and Tammy Murray, and appear to attempt to monitor Plaintiff. (*Id.* ¶¶ 169, 170.)

Smith attended the February 2011 meeting at which the Board considered the salary and vacation requests of the Chief of Police, the Economic Development Director, and the Road Commissioner. She asserts that Selectman Elias quickly moved for a longevity pay increase and additional vacation time for the Chief of Police, even though the Chief had been with the Town for nine years, not 10, the threshold for receiving a longevity pay increase pursuant to Town policy. Mantor also received a longevity increase very quickly. (*Id.* ¶ 171.) Smith characterizes the Board's reaction to Plaintiff's request as "balking," and recalls that one Selectman said, "Joy makes enough." (*Id.* ¶ 172.)

Smith also attended the executive session regarding Plaintiff's grievance. Smith informed the Board that according to the Maine Municipal Association, which Smith contacted in her capacity as Human Resources Officer, Plaintiff was not required to present her grievance to Berry as her grievance involved Berry's conduct. (*Id.* ¶ 174.) After the executive session, Berry confronted Smith in an intimidating fashion and said, "Do you and I have a problem?" Smith responded that she was doing her job as Human Resources Officer. (*Id.* ¶ 175.)

DISCUSSION

## A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"

*Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir.1998)).

The Court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011). If the Court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of her claims, then there is a trial-worthy controversy and summary judgment must be denied to the extent there are supported claims. Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## B.  Discussion

In its Motion for Summary Judgment (ECF No. 22), Defendant challenges each of the four counts of Plaintiff's Amended Complaint (ECF No. 11). Plaintiff concedes that her claim for unpaid wages (Count IV) is not actionable. (Opposition at 17, ECF No. 27.) This Recommended Decision, therefore, focuses on the remaining three counts of the Amended Complaint: sex discrimination (Count I); retaliation for complaining of sex discrimination (Count II); and whistleblower retaliation (Count III).

### 1.  *Sex Discrimination (Count I)*

Plaintiff asserts her claim of sex discrimination under Title VII, 42 U.S.C. § 2000e-2(a), and the Maine Human Rights Act (MHRA), 5 M.R.S. § 4572(1), both of which provisions prohibit discrimination in employment based on gender. "Because the MHRA generally tracks federal anti-discrimination statutes, it is appropriate to look to federal precedent for guidance in interpreting the MHRA." *Winston v. Me. Technical Coll. Sys.*, 631 A.2d 70, 74-75 (Me. 1993). In

the absence of direct proof of sex discrimination, such as in this case, analysis of a sex discrimination claim follows the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Lockridge v. The Univ. of Me. Sys.*, 597 F.3d 464, 470 (1st Cir. 2010); *Daniels v. Narraguagus Bay Health Care Facility*, 45 A.3d 722, 726 (Me. 2012).

In accordance with this framework, Plaintiff carries the initial burden of establishing a prima facie case. *Lockridge*, 597 F.3d at 470. Here, Defendant concedes for summary judgment purposes that the facts establish a prima facie case. (Motion for Summary Judgment at 9.) With this concession, in the context of the Court's summary judgment analysis: (1) Plaintiff is a member of a protected class; (2) she suffered one or more adverse employment actions, including the non-renewal of her contract; and (3) inadequate job performance was not the cause of the adverse employment actions. *Fontanez-Nunez v. Janssen Ortho LLC*, 447 F.3d 50, 55 (1st Cir. 2006); *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994). As to the non-continuation of Plaintiff's contract, the prima facie inquiry also asks whether Plaintiff's "position remained open" and was filled by a man. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Given Defendant's concession of the prima facie case, a male employee was retained to perform the economic development duties formerly performed by Plaintiff although Plaintiff's "director" position was discontinued as the Town assigned the duties to an independent contractor or consultant.

With the prima facie case established, the burden shifts to Defendant to set forth legitimate, non-discriminatory reasons for its adverse employment actions regarding Plaintiff. *Lockridge*, 597 F.3d at 470. In her Opposition to the motion, Plaintiff "assume[d] arguendo that Defendant ha[d] met its minimal burden of production to articulate legitimate non-discriminatory reasons for its

actions." (Opposition at 13-14.) The "ultimate burden" thus returns to Plaintiff, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981), who must "show, by a preponderance of the evidence, that the employer's articulated reason for the adverse employment action is pretextual and that the true reason for the adverse action is discriminatory." *Lockridge*, 597 F.3d at 470. In other words, in the particular context of Count I, Plaintiff's showing must support an inference not merely that Defendant's justification is not worthy of credence (is pretextual), but also that there is evidence capable of supporting a finding that the true reason for the adverse action was the fact that Plaintiff is a woman. *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 105 (1st Cir. 2005) (describing "two hurdles" that must be cleared in the pretext analysis).

Regardless of whether Plaintiff's showing is sufficient as to the first hurdle in the pretext analysis, as explained below, Plaintiff's showing would not support a finding that Plaintiff's gender was the true reason behind certain the adverse actions, including the Town's decision to end Plaintiff's employment.

In an effort to demonstrate that Defendant's adverse action was motivated by animus based on sex or gender, Plaintiff cites the following facts: (a) that Chief Moores and Commissioner Mantor, both males, readily received larger raises and more vacation time than Plaintiff; (b) that Plaintiff's budget was scrutinized, but Moores' and Mantor's larger budgets were not; (c) that the Town Manager yelled at Plaintiff while he did not yell at male employees; (d) that Plaintiff was moved to a new office while the male department heads were not; and (e) that a town official referred to Plaintiff in executive session as "Candy" and thereby likened Plaintiff to a former female Town employee who filed several complaints with the Town, which complaints were alleged to be within the scope of protected activity. (Opposition at 12-13.)

Plaintiff's primary assertions, that she was denied a larger raise and vacation time and that her budget was "scrutinized" because she is female, are not persuasive evidence of gender-based discrimination. Moores and Mantor, the two male employees with whom Plaintiff compares her situation, held their positions considerably longer than Plaintiff. Longevity is a common factor, perhaps the primary factor, in the public sector, for setting compensation. The Town's reliance on longevity as the justification for increasing the compensation for Moores and Mantor, but not increasing Plaintiff's pay, is not a pretext for gender discrimination. In addition, the Town's particular concern about the TIF/economic development budget is understandable. As former Chairman Hagopian testified, the Board did not wish to learn about the distribution of economic development funds to particular projects or persons from members of the public. At least with respect to the claim of gender bias on the part of the Board, this evidence does not support Plaintiff's argument that the Board's request for advance notice of the way in which the funds were distributed is suggestive of bias toward women in the oversight of budgetary matters. In fact,, the Board initially did not impose this requirement when it hired Plaintiff and only did so after Plaintiff made a complaint of gender discrimination to the Board.[18] In short, Plaintiff has failed to present evidence sufficient to establish that the Town's alleged disparate treatment can reasonably be viewed as disparate treatment based on her gender.

As for Plaintiff's reliance on the fact that the Town Manager (Berry) yelled at or raised his voice at Plaintiff more than anyone else in the Town's employ, the record contains some corroborating evidence. The record, however, cannot support the conclusion that Berry raised his voice with or yelled at Plaintiff because of her gender. First, Mantor said that Berry also raised his voice to him on two occasions. Not insignificantly, the record lacks any evidence that Berry

---

[18] As discussed in relation to Count II, the timing of this requirement is probative of retaliatory bias because the Board imposed the change shortly after Plaintiff made her complaint of sex discrimination.

yelled at other female employees. Furthermore, neither the content of, nor the context of the "yelling" incidents suggests that Berry's conduct was based on Plaintiff's gender. The incidents thus cannot serve as the basis for a sex discrimination claim.

Plaintiff next maintains that Berry's decision to move her to a new office is actionable as gender discrimination because Berry did not move the offices of the other department heads, who were male. Of the three department heads (Plaintiff, Moores, and Mantor), Plaintiff's office was the only office susceptible to unnecessary interruptions from members of the public. While the record could support a finding that Berry personally disliked Plaintiff at the time Plaintiff's office was moved, the record simply cannot reasonably support a finding that Berry subjected Plaintiff to adverse treatment because she is female.

Plaintiff also points to the fact that Selectman Elias referred to her during a grievance-related executive session as "Candy," which reference likened Plaintiff to a former female Town employee who grieved various employment matters with the Board. This occurred, she notes, during a hearing in which, in her view, the Board treated her grieved issues dismissively. (Opposition at 13.) The fact that Mr. Elias referred to Plaintiff as "Candy" could be construed as evidence that Mr. Elias and the Board were concerned about Plaintiff's various complaints. However, the reference cannot be considered evidence that the Town's actions were gender based.

### 2. *Retaliation (Count II)*

Plaintiff's claim of retaliation arises out of her sex discrimination claim and under Title VII and the MHRA, which prohibit retaliation against an employee because the employee "made a charge" of discrimination. 42 U.S.C. § 2000e-3(a); 5 M.R.S. § 4572(1)(E). Whereas the prohibition against protected-class discrimination "seeks to prevent injury to individuals based on who they are," the prohibition against retaliation for making a charge "seeks to prevent harm . . .

based on what they do." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). In a retaliation claim, the issue is no longer sex-based or gender bias, but rather whether Plaintiff suffered retaliation for bringing a charge of sex discrimination. *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008).

Because Plaintiff's claim of retaliation relies upon circumstantial evidence, the claim is analyzed with the aid of the *McDonnell Douglas* burden-shifting framework. *Ponte v. Steelcase Inc.*, 741 F.3d 310, 321 (1st Cir. 2014). To establish a prima facie case on her retaliation claim, Plaintiff must demonstrate: (1) that she engaged in protected activity; (2) that she suffered an adverse employment action of a kind that would dissuade a reasonable employee from making a charge in the future; and (3) that the adverse employment action was causally connected to the protected activity. *Id.* If Plaintiff proves a prima facie case, Defendant must present the Court with legitimate, nondiscriminatory reasons for Defendant's actions. *Id.* Finally, if Defendant presents legitimate, nondiscriminatory bases for its conduct, Plaintiff must show that the explanation is a pretext designed to avoid the conclusion that retaliation was the true cause of Defendant's conduct. *Id.* at 323. While a sex discrimination claim calls for proof that sex was a "motivating factor" for an adverse employment action, *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2526 (2013), a retaliation claim requires proof that Plaintiff's "protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534.

Defendant contends that because Berry alone made the decision to end Plaintiff's employment, Berry's intent or motivation alone must be the focus of the retaliation claim. (Motion at 18-19.) Defendant maintains that the only protected activity in which Plaintiff engaged was the claim of discrimination following the Board's denial of her February 2011 request for additional vacation time. At the time, Berry was not employed as town manager. (*Id.*) Defendant argues

that Plaintiff cannot prevail on her retaliation claim because the record contains no evidence that Plaintiff complained to Berry of unlawful sex discrimination. (*Id.* at 18.) Defendant further contends that Plaintiff's subsequent grievance in November 2011 does not constitute protected activity because the grievance does not include an allegation of unlawful discrimination based on sex. (*Id.*)

As Plaintiff argues, contrary to Defendant's argument, "simply because Mr. Berry was not employed by the Town at the time of Ms. Hikel's initial complaint does not mean that he did not become aware of those complaints during his tenure." (Opposition at 14.) Importantly, Berry has never denied knowledge of Plaintiff's discrimination claim. Furthermore, given (1) that Plaintiff's request for an increase in compensation was on the agenda for the first board meeting that Berry attended as town manager, (2) that Berry advised Plaintiff that she need not attend the meeting, (3) that the Board met in executive session to discuss a personnel matter just three days prior to Berry's issuance of the 90-day notice of non-renewal, and (4) that Berry worked regularly and closely with Board members and others (e.g., human resources officer Triss Smith) who were aware of Plaintiff's discrimination claim, one could reasonably infer that at some point prior to Berry's decision not to renew Plaintiff's contract, Berry was aware of Plaintiff's discrimination claim.[19] In addition, for similar reasons (i.e., the likelihood that Berry discussed Plaintiff's employment status with the Board before his decision to end Plaintiff's employment), the Board's possible retaliatory bias could constitute the motivation for any adverse actions.[20] In short, the record would support a finding that Berry was likely aware of Plaintiff's gender discrimination claim, that the

---

[19] At a minimum, whether Berry was aware of the discrimination claim presents a material issue of fact in dispute.

[20] The evidence relevant to retaliatory motive would include the Board's decision to make Berry the sole spokesperson for the Town on the Pipeline Project.

Board was unhappy with Plaintiff's discrimination claim, and that the Board made Berry aware of its unhappiness with Plaintiff for asserting the discrimination claim.

A fact finder can also view the treatment of Plaintiff by the Board and Berry following Plaintiff's gender discrimination claim in March 2011 as adverse treatment in response to the claim. In particular, a fact finder could conclude that after Plaintiff complained to the Board, (a) Berry attempted to install stairs on Plaintiff's property despite Plaintiff's objection, (b) the Board instructed Berry that he was not to commit tax increment financing, which was previously within Plaintiff's authority, without Board approval, (c) Berry requested an increase in the Revolving Loan Fund without discussing the issue with Plaintiff, (d) the Board and Berry moved Plaintiff's office without her consent, (e) Berry and the Board excluded Plaintiff from meetings with the Kennebec Valley Gas Company and removed her as the Town's spokesperson for the pipeline project even though Plaintiff had been working with the company and was the most knowledgeable about the pipeline project, and (f) ultimately, the Board and Berry decided to end Plaintiff's employment with the Town. These events are sufficient to satisfy Plaintiff's prima facie burden. Among other considerations, the adverse actions occurred within a year of March 2011, which is sufficient temporal proximity to satisfy the relatively light burden imposed by the prima facie standard.[21] *DeCaire*, 530 F.3d at 19.

Because Plaintiff has established a prima facie case of retaliation, Defendant must present evidence that its termination of Plaintiff's employment is supported by legitimate, nondiscriminatory reasons. Defendant contends that it ended the employment because of Berry's

[21] Plaintiff's November 2011 grievance against Berry reinforces the temporal relationship. Although Plaintiff did not expressly charge in her November grievance that Berry was mistreating her because she is a woman, her grievance against Berry could be viewed as reinvigorating a preexisting animus harbored by both Berry and the Board, which animus, a fact finder could conclude, arose from Plaintiff's assertion of her rights under anti-discrimination law, as she understood it.

inability to work with Plaintiff. Plaintiff thus must proffer evidence from which a fact finder could conclude that the Town's stated reason is pretextual, and that her complaint of discriminatory conduct was a "but-for cause" of the end of her employment. *Nassar*, 133 S. Ct. at 2534.

While causation is certainly disputed, the record includes evidence from which a fact finder could conclude that Plaintiff's complaint of gender discrimination constitutes the "but-for cause" of the Town's decision not to renew Plaintiff's contract. Not insignificantly, when initially questioned at his deposition about his reasons for ending Plaintiff's employment, Berry was in some ways evasive or nonresponsive. More specifically, Berry stated that he could not recall the reasons for nonrenewal without reviewing the nonrenewal letter. Presumably, had the reason for nonrenewal been as simple and as personal to Berry as Defendant suggests (i.e., Berry's inability to work with Plaintiff), Berry would not have needed any assistance in answering the question. With a record that could support a finding that Plaintiff was effective in her role as Economic Development Director with few complaints about her performance prior to her gender discrimination claim, that she worked well with other employees, and that at least one Board member referred to her as "Candy," a former problem employee who filed complaints with the Town, the record contains facts upon which a fact finder could conclude that the stated reason for ending Plaintiff's employment (i.e., inability to work with Berry) was orchestrated and thus pretextual. Furthermore, the totality of the evidence is sufficient to support a finding that Plaintiff's charge of gender discrimination turned the Board and the Town Manager against her and were the "but-for cause" for the end of her employment and other adverse actions.

### 3. *Whistleblower Retaliation (count III)*

The Maine Whistleblowers' Protection Act (WPA) prohibits employers from discriminating against an employee because the employee, acting in good faith, reports what the

employee reasonably believes is a violation of law. 26 M.R.S. § 833(1)(A). In addition, the WPA "provides a right of action to persons who have been subject to unlawful discrimination, including whistleblowers who have suffered retaliatory discharge or other adverse employment actions." *Costain v. Sunbury Primary Care, P.A.*, 2008 ME 142, ¶ 6, 954 A.2d 1051, 1053 (citing 26 M.R.S. § 833 and 5 M.R.S. §§ 4572(1)(A), 4621). "To prevail on a WPA claim, an employee must show that (1) he engaged in activity protected by the WPA; (2) he experienced an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse employment action." *Currie v. Indus. Sec., Inc.*, 2007 ME 12, ¶ 12, 915 A.2d 400, 404. When there is no direct evidence of discrimination, a WPA claim is evaluated using the *McDonnell Douglas* framework, discussed above. *Id.*, 2007 ME 12, ¶ 13.

Plaintiff alleges in her Amended Complaint that she engaged in protected activity when she complained to Defendant of gender discrimination that she reasonably believed to be in violation of Maine law. (Am. Compl. ¶ 26.) Plaintiff's WPA claim is analyzed in the same manner as her retaliation claim. As explained in the context of the retaliation analysis, because a fact finder could reasonably conclude that Defendant ended Plaintiff's employment because she asserted a gender discrimination claim, Defendant is not entitled to summary judgment.

## CONCLUSION

Based on the foregoing analysis, it is recommended that the Court (a) grant Defendant's Motion for Summary Judgment and enter summary judgment in favor of Defendant on Counts I and IV, and (b) deny Defendant's Motion for Summary Judgment on Counts II and III.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the

district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

June 5, 2014